UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CASSANDRA FAIRBANKS**, | |
| Plaintiff, | |
| v. | Case No. 1:17-cv-01052 (TNM) |
| **EMMA ROLLER**, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Cassandra Fairbanks trolled the web through Twitter, releasing a photo of herself and a fellow journalist in the White House press room making a gesture widely recognized as the "okay" hand symbol but also speculated at the time to be a "white power" symbol. Defendant Emma Roller, also a journalist, retweeted the photo with the caption, "just two people doing a white power hand gesture in the White House." Ms. Fairbanks sued Ms. Roller for defamation. The First Amendment requires that Ms. Fairbanks' claim be considered "against the background of a profound national commitment" to the freedom of speech and especially of political speech, which is "essential to the security of the Republic." *See New York Times v. Sullivan*, 376 U.S. 254, 269-70 (1964). This "fundamental principle of our constitutional system" obligates Ms. Fairbanks, as a public figure, to support her defamation claim by alleging facts that support a finding of actual malice on the part of Ms. Roller. *See id.* at 269, 279-80. Because Ms. Fairbanks has failed to allege such facts, Ms. Roller's Motion to Dismiss under the Federal Rules of Civil Procedure will be granted. The District of Columbia's anti-SLAPP statute does not apply in federal court, so Ms. Roller's Motion to Dismiss and request for attorney's fees under the anti-SLAPP statute will be denied.

# I.

Ms. Fairbanks describes herself as a political activist and a grassroots journalist who uses social media to reach the public.  Am. Compl. 2, ¶ 4.  She describes Ms. Roller as a gatekeeper journalist with an esteemed professional reputation, though she also alleges that Ms. Roller works for a click-bait news site that intentionally publishes fake news.  *Id.* at 2-3.  According to Ms. Fairbanks, gatekeeper journalists like Ms. Roller consider themselves superior to grassroots journalists.  *Id.* at 2.  At the same time, they fear that grassroots journalists threaten their role as "[t]he primary gatekeepers of news."  *Id.*  Because of their fear, Ms. Fairbanks alleges, some gatekeeper journalists "wage a personal, political war on their ideological adversaries and grassroots competitors."  *Id.*  According to Ms. Fairbanks, this conflict intensified when grassroots journalists received White House press passes.  *Id.*

When Ms. Fairbanks received a White House press pass, she and a fellow "new media" journalist posted a picture of themselves making the "okay" hand symbol in the White House press room.  *Id.*  At the time, there was ongoing public debate about whether the alt-right movement had turned the gesture into a hate symbol.  Memo. ISO Mot. Dismiss 2-3 (citing news articles about the "okay" hand symbol).[1]  Ms. Roller retweeted Ms. Fairbanks' photo, adding the caption, "just two people doing a white power hand gesture in the White House."  Am. Compl. ¶ 6.  She followed up with a second tweet, which stated "for reference," provided a link to an article on the Anti-Defamation League website, and contained a graphic of the "okay" symbol

---

[1]  On a motion to dismiss for failure to state a claim, a court may take judicial notice of statements made on the internet when a party relies on them "not for their truth, but merely to show that those statements were made."  *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012).

with the letters *W* and *P* traced over the fingers and the words "white power."[2]  Ms. Roller then

published a third tweet, noting, "people in the alt-right vigorously deny it has anything to do with

white power, but keep using it to annoy the libtards."[3]

Roller's tweets were read, retweeted, and referenced by a variety of "major news outlets,"

though not by any "serious publication in America."  Am. Compl. ¶¶ 8-9.  Ms. Fairbanks

tweeted, "They've become so easy to troll that you don't even have to make an effort anymore,"[4]

and, "The outrage is cracking me up."[5]  Similarly, Ms. Fairbanks responded to a tweet that read,

"Please tell me you guys made the OK sign to troll off this fantastic lefty hysteria," with an

emoji of a smiley face sticking out its tongue and winking.[6]  But then Ms. Fairbanks sued Ms.

Roller, arguing that Ms. Roller's first tweet defamed her.[7]  Ms. Roller filed Motions to Dismiss

under the Federal Rules of Civil Procedure and the District of Columbia anti-SLAPP statute.

---

[2]  Emma Roller, Twitter (Apr. 28, 2017 8:07 PM), available at https://web.archive.org/web/ 20170501041302/https://twitter.com/emmaroller/status/858155641684320256.  The Anti-Defamation League article discusses a two-handed gesture rather than the "okay" symbol.  *See* Am. Compl. ¶ 7.  The Anti-Defamation League later published an article stating that the one-handed "okay" symbol is not a hate symbol and calling the rumor a hoax.  Am. Compl. 1-2, ¶ 10.

[3] Emma Roller, Twitter (Apr. 28, 2017 8:17 PM), available at https://web.archive.org/web/ 20170501041302/https://twitter.com/emmaroller/status/858155641684320256.

[4]  Cassandra Fairbanks, Twitter (Apr. 29, 2017, 8:34 AM), https://twitter.com/CassandraRules/ status/858343836761956352.

[5]  Cassandra Fairbanks, Twitter (Apr. 29, 2017 9:26 AM), available at http://archive.is/HDzMD.

[6]  Cassandra Fairbanks, Twitter (Apr. 29, 2017, 8:47 AM), https://twitter.com/CassandraRules/ status/858346964513107968.

[7]  Ms. Fairbanks' Amended Complaint does not argue that the other tweets defamed her, so my analysis is focused on Ms. Roller's first tweet.

## II.

"[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires that a complaint raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleading facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 545-46. Thus, a court evaluating a motion to dismiss for failure to state a claim does not accept the truth of legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. That said, it construes the complaint in the light most favorable to the plaintiff and accepts as true all reasonable inferences drawn from well-pled factual allegations. *See In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). Consideration is limited to "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. D.C. Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017).

### III.

Under District of Columbia law, a defamation claim requires: (1) a false and defamatory statement; (2) published without privilege to a third party; (3) made with the requisite fault; and (4) damages. *See Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001). Ms. Roller's motions argue that Ms. Fairbanks has not pled facts to support findings of falsity and fault. Ms. Fairbanks concedes that she is a public figure. *See* Pl.'s Opp. to Mot. Dismiss 4 (reciting standard for public figures), 10-12 (applying standard for public figures). Under First Amendment law, this means that she bears a heightened burden on both these elements. *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988).

### A.

The First Amendment requires public figures suing in defamation to "demonstrate by at least a fair preponderance of the evidence that the [allegedly] defamatory statement is false," with close cases decided against them. *Liberty Lobby*, 838 F.2d at 1292. Although the First Amendment permits liability for false factual statements under some circumstances, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Pure statements of opinion can never support liability because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).

Courts in this jurisdiction consider four factors to determine whether a defendant has stated a fact or an opinion. *Ollman v. Evans*, 750 F.3d 970, 979 (D.C. Cir. 1984). First, courts evaluate whether a defendant's statement "has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous" and

thus less likely to carry specific factual connotations. *Id.* Second, courts evaluate whether the statement can be "objectively characterized as true or false" or instead "lacks a plausible method of verification." *Id.* Third, courts evaluate any unchallenged language that provides context for the challenged statement—for example, the uncontested portions of an article or column—to determine whether the context would influence an average reader's perception that the challenged statement has factual content. *Id.* Fourth, courts evaluate the broader context, including social conventions surrounding different types of writing, to determine whether this context signals that a statement concerns fact or opinion. *Id.*

Ms. Roller argues that all four *Ollman* factors show she stated an opinion, not a purported fact, when she tweeted that Ms. Fairbanks made "a white power hand gesture in the White House." Memo. ISO Mot. Dismiss 8-18. First, she argues that her interpretation of the "okay" hand symbol is "indefinite and ambiguous" because the gesture itself means different things in different contexts—sometimes showing agreement, sometimes showing safety, and sometimes showing disagreement, if used sarcastically. *Id.* at 9-12. Second, she argues that her statement is not falsifiable because "white power" is a loosely defined political charge with no concrete and objectively verifiable meaning, much like charges of racism or fascism, which courts have found inactionable. *Id.* at 12-14. Third, she argues that readers would not infer any false facts from her statement because it appears in the context of other tweets that state the true factual bases for her interpretation of the gesture. *Id.* at 14-16. Fourth, she argues that the social conventions surrounding political disagreements and off-the-cuff statements on Twitter made readers unlikely to interpret her statement as factual. *Id.* at 16-18.

But the *Ollman* factors do not point in Ms. Roller's favor as strongly as she suggests. Ms. Roller's argument about the first *Ollman* factor depends on the mistaken assumption that it

is impossible to make a clear statement about an ambiguous gesture.[8]  A simple illustration shows the flaw in this logic: People wave in greeting and in parting, but the ambiguity of the gesture does not make the sentence "she waved goodbye" ambiguous or indefinite.  Ms. Roller's argument about the second *Ollman* factor relies almost entirely on analogies to statements in other cases about plaintiffs' views or attitudes but does not address the fact that views and attitudes are subjective realities while physical gestures are objective realities.[9]  Her argument about the third *Ollman* factor suggests that readers would not infer false facts from her tweet but does not address whether her tweet makes a false factual statement directly.  And her argument about the fourth *Ollman* factor notes that society generally has low expectations of political debates on Twitter but does not address society's expectations of journalistic conduct on Twitter.

One can imagine situations in which a defendant's characterization of a plaintiff's gesture would be arguably defamatory.  For example, a defendant might claim that the plaintiff "flipped me off" when the evidence showed the plaintiff actually gave a thumbs-up, or a defendant might claim that the plaintiff performed the Nazi salute when the plaintiff merely waved hello.  These demonstrably false factual statements would differ from related, but protected, statements of

---

[8]  Ms. Roller cites *McCaskill v. Gallaudet University* for the proposition that where "different constituencies can hold different—and completely plausible—views of Plaintiff's actions, statements characterizing those actions constitute protected opinion."  36 F. Supp. 3d 145, 159 (D.D.C. 2014).  But Ms. Roller herself notes that this rule pertains to a statement's verifiability, not to its clarity.  Memo. ISO Mot. Dismiss 10.  And *McCaskill* addressed the verifiability of plausible characterizations.  Here, Ms. Roller's argument about the gesture's ambiguity declines to address plausibility, expressly "setting aside whether it has a political meaning."  *Id.* at 10.

[9]  Ms. Roller draws this distinction herself, asking me not to treat her statement about Ms. Fairbanks' gesture as a statement about her personal beliefs.  *Id.* at 13.  But neither party has briefed the issue well, and Ms. Roller's interpretation of the gesture's meaning involves at least somewhat more subjectivity than a simple description of the physical gesture.  The only case that the parties cite for its treatment of a statement characterizing a Plaintiff's conduct is *McCaskill*, a district court decision holding that a plausible characterization of ambiguous conduct was not falsifiable.  *See McCaskill*, 36 F. Supp. 3d at 159.

opinion such as, "She is a vulgar person," or "He is a Nazi-lover." *Cf. Buckley v. Littell*, 539

F.2d 882, 893-94 (2d Cir. 1976) (distinguishing the factual allegation that a plaintiff was a

member of the Communist Party from the statement of opinion that plaintiff is "a fellow traveler

of fascism"); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (holding that

general accusations of being "racist and anti-Semitic" state opinion and not fact).  While the

allegation that Ms. Fairbanks displayed a "white power gesture" is arguably more ambiguous

than an allegation that the plaintiff flipped someone off or performed the Nazi salute, this

ambiguity is not clearly fatal to her suit against Ms. Roller.

"While courts [of different jurisdictions] are divided in their methods of distinguishing

between assertions of fact and expressions of opinion, they are universally agreed that the task is

a difficult one." *Ollman*, 750 F.2d at 978.  "Where the question of truth or falsity is a close one,

a court should err on the side of nonactionability." *Liberty Lobby*, 838 F.2d at 1292.  But since

actual malice presents a clearer question and requires dismissal of the case, I need not decide

whether Ms. Roller's tweet constitutes a protected statement of opinion.

## B.

The First Amendment requires public figures suing in defamation to establish by clear

and convincing evidence that the defendant's fault rises to the level of "actual malice." *Liberty*

*Lobby*, 838 F.2d at 1292.  That is, public figures must establish that the defendant made the

allegedly defamatory statement "with knowledge that it was false or with reckless disregard of

whether it was false or not." *Sullivan*, 376 U.S. at 280.  Because free debate inevitably leads to

some mistaken statements and punishment of these statements would chill the freedom of

speech, reckless disregard requires a "high degree of awareness of . . . probable falsity."

*Garrison v. La.*, 379 U.S. 64, 74 (1964).  "The actual malice inquiry focuses on the defendant's

state of mind at the time of publication." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 118 (D.C. Cir. 2017).

Ms. Fairbanks seeks to prove actual malice in four ways.  First, she alleges that Ms. Roller knew the "okay" symbol is not a white power gesture. Pl.'s Opp. to Mot. Dismiss 11. Second, she alleges that Ms. Roller failed to perform due diligence consistent with professional standards of journalism. *Id.* Third, she alleges that Ms. Roller, as a gatekeeper journalist, has a motive to smear Ms. Fairbanks' reputation as a competing grassroots journalist and "continues a campaign of smears." *Id.* at 11-12; *see also* Am. Compl. 2. Fourth, she argues that Ms. Roller's "failure to issue a single correction or retraction" suggests her recklessness about truth. Pl.'s Opp. to Mot. Dismiss 11; *but see* Am. Compl. ¶ 17 (implying that Ms. Roller deleted her tweet); Compl. 2 (alleging that Ms. Roller deleted her tweet before learning of this lawsuit).

None of these arguments comes close to satisfying the First Amendment's demanding standard for public figures bringing defamation actions. Ms. Fairbanks' first argument fails because she has not pled facts sufficient to support her conclusory allegation that Ms. Roller knew the falsity of her statement.[10] Her second and third arguments fail because, even "an extreme departure from professional standards" coupled with an illicit motive does not satisfy the actual malice standard. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989); *see also Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) ("Subjective ill-will

---

[10]  Ms. Fairbanks alleges, "Roller knew at the time of her publishing that Fairbanks was a long-time civil rights writer, journalist, and advocate, who backed Donald Trump's candidacy for the Presidency only also after protesting civil rights violations against a wide range of citizens, including women and African-Americans, and after Fairbanks had previously backed Bernie Sanders's presidential bid.  Roller knew Fairbanks was not using 'white power' signals before she published her false stories on April 28, 2017." Am. Compl. ¶ 11.  But the second sentence is conclusory and the first fails to provide a "clear and convincing" basis for finding that Ms. Roller knew the "okay" gesture does not symbolize white power. *See Liberty Lobby*, 838 F.2d at 1292.

does not establish actual malice, nor does a malevolent motive for publication.  Even highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers does not establish actual malice.") (internal citation omitted).  And her fourth argument fails because Ms. Roller's failure to correct her statement does not show that she had actual malice when she published it.  *See Kahl*, 856 F.3d at 118 (requiring evidence of actual malice at the time of publication); *see also Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 56 (D.D.C. 2002) ("[T]here is no duty to retract or correct a publication . . . .").  Especially given the public debate about the "okay" hand gesture at the time of Ms. Roller's tweet, Ms. Fairbanks' allegations do not provide clear and convincing evidence of actual malice.  Indeed, the inescapable conclusion one reaches upon viewing the photo and tweets at issue (including Ms. Fairbanks' tweets) is that Ms. Fairbanks intended her photo and hand gesture to provoke, or troll, people like Ms. Roller—whether because the gesture was actually offensive or because they would think that it was offensive—not that Ms. Fairbanks was the victim of a malicious attack based on innocent actions.  So Ms. Fairbanks has failed to state a claim and her case should be dismissed.

## C.

Dismissing the Amended Complaint for failure to state a claim does not moot Ms. Roller's anti-SLAPP motion since the motion seeks attorneys' fees in addition to dismissal. The District of Columbia's anti-SLAPP statute seeks to protect people from "Strategic Lawsuits Against Public Participation" or SLAPPs—that is, from illegitimate lawsuits designed to discourage free speech on issues of public interest.  *See Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1332 (D.C. Cir. 2015).  Among other things, the statute establishes a mechanism for early dismissal of SLAPPs and enables defendants who win dismissal under the statute to recover their attorneys' fees.  D.C. Code §§ 16-5502(a)-(b), 16-5504(a).  But Ms. Fairbanks argues that the

anti-SLAPP statute does not properly apply in federal courts exercising diversity jurisdiction over local law claims.

A federal court sitting in diversity generally applies local substantive law and federal procedural rules. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). If local substantive law and the Federal Rules of Civil Procedure answer the same question in different ways, the Federal Rules of Civil Procedure control unless they exceed the authorization of the Rules Enabling Act. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010). The United States Court of Appeals for the District of Columbia Circuit has already determined under this framework that "[a] federal court exercising diversity jurisdiction . . . must apply Federal Rules 12 and 56 instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision." *Abbas*, 783 F.3d at 1337. And it has determined that this holding prevents an award of attorneys' fees under the anti-SLAPP statute since the relevant provision requires a defendant to invoke the special motion to dismiss provision successfully. *See id.* at 1337 n.5 (citing D.C. Code § 16-5504(a)).

Ms. Roller argues that the District of Columbia Court of Appeals' subsequent decision in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016), supersedes *Abbas*. She notes that *Mann* clarified two facts about the District's anti-SLAPP statute that differ from the understanding in *Abbas*. Memo. ISO Anti-SLAPP Mot. 5. First, *Mann* held that the anti-SLAPP statute creates substantive rights. *Mann*, 150 A.3d at 1226. Second, it held that the statute's "likely to succeed" standard of proof for special motions to dismiss mirrors the summary judgment standard of proof under Federal Rule of Civil Procedure 56. *Id.* at 1238 n.32.

*Mann*'s articulation of District law—and not *Abbas*'s interpretation of it—controls. *See Payne v. D.C. Gov.*, 722 F.3d 345, 353 (D.C. Cir. 2013) (noting that District of Columbia Court

of Appeals decisions provide binding interpretations of District law).  But I am also bound to follow *Abbas* as the law of the Circuit unless *Mann* "clearly and unmistakably" resolves the question at issue.  *See Easaw v. Newport*, 253 F. Supp. 3d 22, 34 (D.D.C. 2017).  Two of my colleagues have already determined that *Abbas* remains binding after *Mann*.  *See Libre by Nexus v. Buzzfeed, Inc.*, 2018 WL 2248420 at *9 (D.D.C. May 16, 2018); *Deripaska v. Associated Press*, 2017 WL 8896059 at *3 (D.D.C. Oct. 17, 2017).  Indeed, I am not aware that any judge in this District has awarded attorneys' fees under the anti-SLAPP statute since *Mann*.

Because *Abbas*'s application of the *Shady Grove* framework does not depend on either of the points that *Mann* later clarified, I join my colleagues in concluding that *Abbas* controls.  The reasoning in *Abbas* begins with the observation that the anti-SLAPP statute and Federal Rules of Civil Procedure 12 and 56 "answer the same question about the circumstances under which a court must dismiss a case before trial."  *Abbas*, 783 F.3d at 1333-34.  *Mann* does nothing to disturb this understanding of District law.

*Abbas* goes on to observe that the anti-SLAPP statute and the Federal Rules of Civil Procedure answer the same question in different ways: "[U]nlike the D.C. Anti–SLAPP Act, the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid pre-trial dismissal."  *Id.* at 1334.  And *Mann* confirms this conclusion.  As Ms. Roller notes, *Mann* clarifies that the anti-SLAPP statute's "likelihood of success on the merits" standard mirrors the Rule 56 summary judgment standard, requiring that "the evidence suffices to permit a jury to find for the plaintiff."[11]  *Mann*, 150 A.3d at 1238 n.32.  But like a mirror, the anti-SLAPP statute reverses the image that it reflects: *Mann* agrees with *Abbas* that the statute differs

---

[11]  Ms. Roller's other observation—that *Mann* clarified the substantive nature of the anti-SLAPP statute—confirms that the *Shady Grove* framework applies and does not alter how.  *See* Memo. ISO Anti-SLAPP Mot. 5.

from Rule 56 by requiring the plaintiff to show a likelihood of success on the merits instead of placing the burden on the defendant. *Id.* And *Mann* adds that the statute's dismissal standard differs from Rule 12 by requiring the plaintiff to produce evidence rather than allowing the plaintiff to rely on the allegations in her complaint. *Id.* at 1233; *see also Libre by Nexus*, 2018 WL 2248420 at *9. In short, *Mann* does not align the District's anti-SLAPP statute with the Federal Rules. Instead, it expressly states that the statute "is not redundant relative to the rules of civil procedure." *Mann*, 150 A.3d at 1238.

The final question that *Abbas* addressed under the *Shady Grove* framework is whether Federal Rules of Civil Procedure 12 and 56 exceed the authorization of the Rules Enabling Act. *See Shady Grove*, 559 U.S. at 398. *Abbas* held that Rules 12 and 56 do not. *Abbas*, 783 F.3d 1336-37. As a local court, *Mann* had no occasion to explore the validity of the Federal Rules. Thus, *Mann* does not undermine *Abbas* in this respect either.

According to Ms. Roller, "*Mann* could not have spoken more 'clearly and unmistakably' to . . . whether the standards imposed by [the anti-SLAPP statute] are the same or different than those imposed by the Federal Rules of Civil Procedure." Memo. ISO Anti-SLAPP Mot. 5. I believe it "clearly and unmistakably" confirms *Abbas*'s determination that they differ. In any event, it does not show that the anti-SLAPP statute should apply in federal court. So I am bound by the law of the Circuit and must dismiss Ms. Roller's anti-SLAPP motion.

## IV.

Some countries criminalize gestures that others may take as racist or hateful. *See, e.g.*, Strafgesetzbuch (StGB) (Penal Code), § 130, http://www.gesetze-im-internet.de/ englisch_stgb/englisch_stgb.html#p0080 (German law criminalizing incitement to hatred against certain groups, which has been used to prosecute individuals who perform the Nazi salute); Code

13

Pénal [C.Pén] art. 144 (Belgian law criminalizing the use of actions, words, gestures, or threats to insult religious objects). But in America, the First Amendment's commitment to a public debate that is "uninhibited, robust, and wide-open," *Sullivan*, 376 U.S. at 270, offers broad protections to those who make these gestures and those who accuse public figures of making them.

For the reasons explained above, the Defendant's Motion to Dismiss under the Federal Rules of Civil Procedure will be granted and the Defendant's Motion to Dismiss under the District of Columbia anti-SLAPP statute will be denied. A separate order will issue.

Dated: June 6, 2018

TREVOR N. MCFADDEN
United States District Judge

14